No. 23-2097

IN THE

# United States Court of Appeals

FOR THE SEVENTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ANTHONY GAY,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Central District of Illinois, No. 20-cr-40026
The Honorable James E. Shadid

**BRIEF FOR THE UNITED STATES**

GREGORY K. HARRIS
  *United States Attorney*

W. SCOTT SIMPSON
  *Assistant United States Attorney*
  *Office of the United States Attorney*
  *318 South Sixth Street*
  *Springfield, Illinois 62701-1806*
  *(217) 492-4413*

# TABLE OF CONTENTS

Page

TABLE OF CASES, STATUTES, AND OTHER AUTHORITIES.............................iv

JURISDICTIONAL STATEMENT .................................................................1

ISSUES PRESENTED FOR REVIEW ............................................................2

STATEMENT OF THE CASE ......................................................................3

   A. Prior Offenses and Parole Status.......................................................3

   B. Offense Conduct ...........................................................................3

      1. Possession of handgun ..............................................................3

      2. Possession of ammunition .........................................................7

   C. Indictment, Pretrial Proceedings, Mandamus Petition, and Mistrial ..........11

      1. Gay's representation status .......................................................11

      2. Continuances ........................................................................12

      3. Speedy trial issues.................................................................12

      4. Motion to suppress (ammunition charge)....................................12

      5. Petition for writ of mandamus...................................................14

      6. Mistrial...............................................................................14

      7. Pretrial conference ................................................................15

      8. Parties' pretrial motions..........................................................16

   D. Trial Proceedings .......................................................................20

1.  Testimony and other evidence .................................................... 20

2.  Trial motions ............................................................................ 28

3.  Jury deliberation and verdict .................................................. 28

E.  Gay's post-trial motions ............................................................... 29

1.  "Consolidated post-trial motions" ......................................... 29

2.  Motion for new trial ("newly discovered evidence") .............. 30

F.  Sentencing and Judgment ............................................................ 31

G.  Appeal .......................................................................................... 32

SUMMARY OF THE ARGUMENT .................................................. 33

ARGUMENT ....................................................................................... 34

I.  Ample Evidence Supported the Jury's Guilty Verdicts ..................... 34

A.  Legal Framework and Standard of Review .................................... 34

B.  Analysis ........................................................................................ 35

1.  The evidence was more than sufficient to support the verdict
on both counts ......................................................................... 35

2.  Gay's arguments to the contrary are without merit ................. 39

3.  Gay is not entitled to a new trial ............................................ 42

II. The District Court Correctly Denied Gay's Motion to Suppress ....... 44

A.  Standard of Review ....................................................................... 44

B.  Legal Framework .......................................................................... 44

C.  Analysis ........................................................................................ 45

III. The District Court Acted Well Within Its Discretion In Excluding Certain Evidence .................................................................................. 48

    A. Legal Framework and Standard of Review ...................................... 48

    B. The Exclusion of Additional Evidence Regarding the Police Encounter of May 23 Was Within the Court's Discretion ...................................... 49

    C. The Exclusion of Jason Foy's Testimony Was Within the Court's Discretion ...................................................................................... 50

IV. The District Court Acted Well Within Its Discretion In Denying Gay's Motion For New Trial Based On "Newly Discovered Evidence" .................. 54

    A. Legal Framework and Standard of Review ...................................... 54

    B. Analysis ...................................................................................... 54

V. The District Court Acted Well Within Its Discretion In Scheduling The Retrial .............................................................................................. 56

VI. Gay's *Bruen* Challenge Is Waived And Lacks Merit ........................... 59

    A. Standard of Review ...................................................................... 59

    B. Gay Waived His *Bruen* Claim ...................................................... 59

    C. Gay's *Bruen* Claim Is Without Merit ........................................... 60

        1. Legal background ................................................................. 61

        2. Analysis ............................................................................. 64

CONCLUSION ................................................................................... 73

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF CASES, STATUTES, AND OTHER AUTHORITIES

Page(s)

**Cases**

*Arrigo v. Link*, 836 F.3d 787 (7th Cir. 2016) .................................................. 49

*Atkinson v. Garland*, 70 F.4th 1018 (7th Cir. 2023) ............................................ passim

*Baze v. Rees*, 553 U.S. 35 (2008) ................................................................70-71

*Crane v. Kentucky*, 476 U.S. 683 (1986) ............................................................ 48

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ................................. passim

*Greer v. United States*, 141 S. Ct. 2090 (2021) ................................................... 53

*Hinkle v. Neal*, 51 F.4th 234 (7th Cir. 2022) ..................................................... 48

*Holmes v. South Carolina*, 547 U.S. 319 (2006) ............................................... 48

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) .................................................... 72

*Medina v. Whitaker*, 913 F.3d 152 (D.C. Cir. 2019).........................................65, 70, 71

*New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) ........................ passim

*Range v. Garland*, 69 F.4th 96 (3d Cir. 2023) .............................................60, 67, 68

*Rehaif v. United States*, 139 S. Ct. 2191 (2019)................................................... 53

*Richardson v. Ramirez*, 418 U.S. 24 (1974) ....................................................... 65

*Samson v. California*, 547 U.S. 843 (2006) ...............................................45, 47

*Sanchez v. City of Chicago*, 880 F.3d 349 (7th Cir. 2018) ............................... 48

*Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678 (6th Cir. 2016)............................ 65

*United States v. Anderson*, 988 F.3d 420 (7th Cir. 2021)....................................38

*United States v. Avery*, 208 F.3d 597 (7th Cir. 2000) .......................................56, 57, 58

*United States v. Butler*, 58 F.4th 364 (7th Cir. 2023) .........................................53, 58, 59

*United States v. Carpio-Leon*, 701 F.3d 974 (4th Cir. 2012) ........................................ 66

*United States v. Chanu*, 40 F.4th 528 (7th Cir. 2022) ................................................. 59

*United States v. Coscia*, 4 F.4th 454 (7th Cir. 2021) .................................................. 54

*United States v. Davis*, 604 F.2d 474 (7th Cir. 1979) ................................................. 56

*United States v. Dvorkin*, 799 F.3d 867 (7th Cir. 2015) .............................................. 52

*United States v. Egwaoje*, 335 F.3d 579 (7th Cir. 2003) ............................................ 56

*United States v. Farmer*, 38 F.4th 591 (7th Cir. 2022) ............................................... 34

*United States v. Fitzpatrick*, 32 F.4th 644 (7th Cir. 2022) ..................................... 34, 38

*United States v. Friedman*, 971 F.3d 700 (7th Cir. 2020) ...................................... 54, 55

*United States v. Hidalgo-Sanchez*, 29 F.4th 915 (7th Cir. 2022) ............................ 34, 35

*United States v. Howell*, 958 F.3d 589 (7th Cir. 2020) .............................................. 37

*United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023) ..................................... 62, 68, 69

*United States v. Jimenez*, 895 F.3d 228 (2d Cir. 2018) .............................................. 64

*United States v. Kelly*, 519 F.3d 355 (7th Cir. 2008) ................................................. 39

*United States v. Lawrence*, 788 F.3d 234 (7th Cir. 2015) ........................................... 39

*United States v. Lundberg*, 990 F.3d 1087 (7th Cir. 2021) ...................................... 34-35

*United States v. McNeal*, 900 F.2d 119 (7th Cir. 1990) .......................................... 39, 40

*United States v. Meza-Rodriguez*, 798 F.3d 664 (7th Cir. 2015) ................................. 66

*United States v. Miles*, 86 F.4th 734 (7th Cir. 2023) ................................................. 63

*United States v. Mosby*, 541 F.3d 764 (7th Cir. 2008) ............................................... 44

*United States v. Norwood*, 982 F.3d 1032 (7th Cir. 2020) ..................................... 34, 38

*United States v. Posey*, 655 F. Supp. 3d 762 (N.D. Ind. 2023) .................................... 65

*United States v. Price*, 656 F. Supp. 3d 772 (N.D. Ill. 2023) ...................................... 66

*United States v. Procknow*, 784 F.3d 421 (7th Cir. 2015) ........................................ 44, 46

*United States v. Pulliam*, 973 F.3d 775 (7th Cir. 2020) ............................................ 48, 53

*United States v. Richards*, 741 F.3d 843 (7th Cir. 2014) ....................................44-45, 47

*United States v. Starks*, 309 F.3d 1017 (7th Cir. 2002) ............................................ 39, 40

*United States v. Wash*, 231 F.3d 366 (7th Cir. 2000) ...................................48-49, 50, 52

*United States v. White*, 781 F.3d 858 (7th Cir. 2015)................................................ 45

*United States v. Wright*, 85 F.4th 851 (7th Cir. 2023) ............................................. 34, 38

*United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010)................................................. 65

*Vincent v. Garland*, 80 F.4th 1197 (10th Cir. 2023) ................................................. 63

*White v. United States*, 8 F.4th 547 (7th Cir. 2021) ....................................................... 59

**Statutes**

18 U.S.C. § 922 ....................................................................................... passim

18 U.S.C. § 3231 .............................................................................................. 1

28 U.S.C. § 1291 .............................................................................................. 1

730 Ill. Comp. Stat. Ann. 5/3-3-7 (West 2018) .......................................... 45

**Other Authorities**

1 The Statutes at Large; Being A Collection of All the Laws of Virginia (1823).... 68

1 W. & M., Sess. 2, c. 2, in 6 *The Statutes of the Realm* (1688) .................................... 67

2 Bernard Schwartz, *The Bill of Rights: A Documentary History* (1971).................... 70

2 *Records of the Colony of Rhode Island and Providence Plantations* (1857)................. 68

4 *Journals of the Continental Congress 1774-1789* (1906)
    (resolution of March 14, 1776) ................................................................ 69

*7 Records of the Colony of Rhode Island and Providence Plantations in New England* (1862) ...................................................................................... 69

1776 Mass. law ............................................................................................................. 69

Act of Apr. 1, 1778, ch. LXI, § 5, 1777-1778 P.A.Laws ................................................ 69

*Acts of the General Assembly of the State of New-Jersey at a Session Begun on the 27th Day of August, 1776* (1777) ................................................................... 69

Akhil Reed Amar, *The Bill of Rights* (1998) ................................................................ 64

Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* (1868) .................................. 64

Fed. R. Crim. P. 29 ...................................................................................................... 34

Fed. R. Crim. P. 33 ............................................................................................... 42, 54

Fed. R. Evid. 402 .......................................................................................................... 48

Fed. R. Evid. 403................................................................................................ 48, 50, 52

*The Public Records of the Colony of Connecticut From May, 1775 to June, 1776* (1890) (1775 Conn. law) ........................................................................... 69

## JURISDICTIONAL STATEMENT[1]

The jurisdictional statement in the defendant's brief is not complete and correct.

An indictment charged Anthony Gay with possessing a firearm and ammunition as a felon, in violation of 18 U.S.C. § 922(g). A jury found Gay guilty, and the district court sentenced him on May 24, 2023, then entered judgment on May 25, 2023. That court had jurisdiction pursuant to 18 U.S.C. § 3231.

Gay filed a timely notice of appeal on May 31, 2023. This Court's jurisdiction is based on 28 U.S.C. § 1291.

---

[1] We use the following abbreviations: "R." followed by a number refers to a document in the district court record; "D.E." followed by a date refers to a docket entry in the district court record; "Pretrial Tr." refers to the transcript of the pretrial conference held on April 27, 2022 (R.459); "Motion Tr." refers to the transcript of the motion hearing held on May 9, 2022 (R.338); "Tr." refers to the transcript of the second trial (RR.379-382); "Gov.Ex." refers to a government trial exhibit; "PSR" refers to the second revised presentence report (R.435); "Sent.Tr." refers to the transcript of the sentencing hearing (R.451; R.453); and "Def.Br." refers to the appellant's brief in this appeal.

## ISSUES PRESENTED FOR REVIEW

I.   Did sufficient evidence support the jury's guilty verdicts?

II.  Did the district court correctly deny the defendant's motion to suppress evidence?

III. Did the district court act within its discretion in excluding certain evidence at trial?

IV.  Did the district court act within its discretion in denying the defendant's motion for a new trial based on "newly discovered evidence"?

V.   Did the district court act within its discretion in scheduling the retrial?

VI.  Did the defendant waive any facial or as-applied challenge to the constitutionality of 18 U.S.C. § 922(g)(1); alternatively, does any such challenge lack merit?

## STATEMENT OF THE CASE

A.   Prior Offenses and Parole Status

Before the events giving rise to this case, the defendant, Anthony Gay, had incurred felony convictions in Illinois for robbery; aggravated battery of a correctional employee (twenty counts); and possession of a weapon as a felon in prison. Tr.219-44; Gov.Ex.16. Gay received sentences from three years to eight years in prison on each of those convictions, some running consecutively and some concurrently. Gov.Ex.16. As a result, he was in state prison from 1994 until 2018. *Id.* at 1-2.

Upon Gay's release in 2018, he signed a parole agreement and a Project Safe Neighborhoods letter acknowledging that he was prohibited from possessing a firearm. Tr.239-43; Gov.Ex.16. Gay's parole agreement also stated that he would "consent to a search of [his] person, property, or residence." Gov.Ex.16 at 3; Tr.405-06. The date of Gay's final release from state prison (and thus the ending date of his parole) was July 14, 2020. Gov.Ex.16 at 2.

B.   Offense Conduct

1.   Possession of handgun

During the night of May 30-31, 2020, Officers Zachary Costas and Quentin Sailor of the Rock Island Police Department were patrolling in a residential area. Tr.76-81. Both officers were in uniform, and Costas was driving their unmarked

3

car. Tr.77, 112. Before midnight, they passed Gay. Tr.85-86, 128. As the officers drove by, Gay stopped walking and "just stared into [the patrol] car." Tr.128.[2]

Shortly after midnight, about an hour after seeing Gay and about a block away from that encounter, Costas and Sailor were headed east on 13th Avenue and reached a stop sign at 7th Street. Tr.76-77, 80, 86, 112-13, 183-84, 190-91; Gov.Ex.4. While stopped, they saw a black Dodge Caliber traveling northbound on 7th Steet, which stopped at the intersection even though there was no stop sign for traffic on 7th Street. Tr.80, 112-13. Costas motioned for the other driver to continue, and the Dodge very quickly pulled away from the intersection. Tr.81, 113-14. As the car passed, Costas saw that it lacked lighting over the rear license plate. Tr.81. Costas decided to pull over the Dodge for that violation, and he turned to follow it. Tr.82. The officers were not aware that Gay was in the Dodge. Tr.183.

As soon as the patrol car turned, the Dodge began speeding away. Tr.82-83. After about eight blocks, the Dodge was "traveling at a high [rate] of speed," and the patrol car was having trouble catching up. *Id.* The Dodge continued two more blocks, then turned onto 5th Avenue. Tr.82-83, 113-14. The patrol car

---

[2] Sailor had also seen Gay earlier on May 30, in mid-afternoon, when Sailor responded to a call regarding a vehicle fleeing from officers. Tr.184-85, 191. Sailor found a car matching the description given; he saw Gay fleeing from the car; and he arrested Gay. Tr.192-93. As a result of that incident, Gay was charged with offenses including resisting or obstructing an officer and fleeing or attempting to elude an officer. Tr.194.

caught up, and the Dodge tried to pull into a driveway on 6th Street, but was "going a little too fast and didn't make the driveway." Tr.83. The car ended up "in the middle of the driveway in the alley in between 5th and 6th Street[s]." *Id.*; Gov.Ex.4-2. As the Dodge was coming to a stop, Costas turned on the patrol car's emergency lights to initiate a traffic stop. Tr.83-84.

As soon as the Dodge stopped, the front passenger door opened and the passenger got out. Tr.84. Both officers recognized Gay. Tr.84-85, 115-16. Costas got out of the patrol car and yelled at Gay to stop. Tr.84-85. Gay looked back toward the officers, then "reached down toward his waistband" and started fleeing. Tr.84-85, 115-16. Although Costas saw Gay reach toward his waistband, given his vantage point, he could not see Gay's waistband, and he did not see anything in Gay's hands. Tr.92-93.

After looking over his shoulder toward Costas and Sailor, Gay initially "walked hastily" then ran toward the south along the alley. Tr.91, 116-17. Sailor exited the patrol car and chased Gay. Tr.91-92, 116-18. Sailor noticed that Gay, at least initially, was moving "hunched over" with his hands held out in front of him, "as if he probably was like holding something." Tr.117. Although Sailor could not see anything in Gay's hands, the officer was concerned about Gay's "weird" posture in relation to the possibility of weapon possession. Tr.118.

5

As Sailor gave chase, he yelled for Gay to stop. Tr.118-19. As Gay continued running, Sailor noticed that Gay was not swinging his arms as one normally does while running. Tr.119. Sailor initially took out his gun while chasing Gay, in light of "the totality of everything, dark alley, going [on] a foot chase by [himself]." Tr.120. Gay turned left to run around a detached garage and "fell flat" on the ground near a concrete pad, but quickly got up and continued running. Tr.120-21, 124-25, 165-66, 171. Sailor, coming around the corner of the garage after Gay, re-holstered his gun, got out his Taser, and continued yelling for Gay to stop. Tr.121.

Gay then stopped running and surrendered. Tr.126-27. Sailor handcuffed him and led him back toward the patrol car. *Id.* As they approached the garage where Gay had fallen, Sailor radioed his status and Gay yelled, "Why are you f---ing with me, man?!" as he jerked forward against Sailor's restraint. Gov.Ex.5, 12:03:59-12:04:12 a.m.[3] Sailor responded, "Be still. Just calm down." *Id.* Sailor was out of breath after running and because of wearing a COVID-19 mask. Tr.154. Upon arriving at the patrol car, Sailor searched Gay and found no contraband, then seated him in the back of the car. Tr.127.

Meanwhile, as Sailor ran after Gay, Costas approached the Dodge, contacted the driver and a back-seat passenger, and notified the dispatcher. Tr.91-92. With

---

[3] Government Exhibit 5 is Sailor's bodycam video. Tr.151-52.

consent, Costas searched the Dodge, the driver, and the back-seat passenger, and found no contraband. Tr.94. The driver received a ticket for having no rear license-plate light. Tr.140.

Once Gay was secured in the patrol car, Sailor and another officer who had arrived at the scene retraced Gay's flight path with flashlights to look for discarded items. Tr.129; Gov.Ex.5, 12:7:07-12:08:45 a.m. Approximately where Gay had fallen – near where his left hand would have been on the ground – the officers found a black Glock handgun. Tr.130-31; Gov.Ex.5, 12:7:29-12:08:45 a.m. The gun was not dirty or rusty; "[i]t looked like it had just been freshly placed [there]." Tr.130-31. Sailor reported the gun to the dispatcher, and another officer took photographs. Tr.131, 139; Gov.Exs.3 through 3-7.

Sailor then retrieved and bagged the gun, wearing gloves. Tr.139.

## 2. Possession of ammunition

A few weeks earlier, on May 11, 2020, Gay checked into the American Motor Inn in Rock Island. Tr.249-52. He stayed in Room 133, which the hotel had cleaned before Gay checked in, including checking for any property left behind by the prior guest. Tr.272-73, 275, 320; Gov.Ex.15-2. After two extensions of Gay's week-long stays, he was scheduled to check out on June 1, 2020, and had paid for the room up to that date. Tr.254-59; Gov.Ex.15-2.

On June 1 – the day after the events described above – one of the hotel managers, Pritesh Patel,[4] received a three-way telephone call from Gay and his girlfriend. Tr.261-62; Gov.Exs.14, 14-1a. Gay told Patel he was in jail and asked Patel to allow his girlfriend to retrieve his property from Room 133. Gov.Ex.14-1a. Gay said, among other things, "I'm up in jail for a little while, man it's me, always complainin' about you lettin' people in my room that's my girlfriend, she can go in there and get my property." *Id.* Patel declined to release Gay's property to his girlfriend unless the police were present (or under a court order), referring to Gay's prior complaints and the hotel's need for verification. Gay persisted, saying, "Yeah I know . . . but . . . these are different circumstances I'm locked up and I'm not . . . gonna get out for at least a month or so, so I want her to get my property out of there." *Id.* But Patel reiterated, "Remember you told me here you don't want anybody inside of your room so I cannot let anybody but you." *Id.*[5] Gay declined to involve the police, saying, "I don't like the police man I'm not sending no police to yo hotel, I hate the police the police got me locked up . . . ." *Id.*; Tr.272-73.

-----

[4] Pritesh Patel is referred to herein as Patel. When referenced by name, his wife is referred to as Kalpanaben Patel.

[5] At trial, Patel testified that Gay stayed at the hotel several months earlier and falsely accused hotel personnel of letting the police enter Gay's room. Tr.263-64; *see* Gov.Ex.15-2.

Gay asked Patel what he would do with Gay's property in the meantime, and Patel said he would put it in storage. Gov.Ex.14-1a. Gay acknowledged, "[M]y time is up in that room," and proposed that the hotel put his property outside the room and let his girlfriend pick it up. *Id.* Patel declined and said the hotel would "throw [Gay's property] in the garbage." *Id.* Patel reiterated, "Court order for your girlfriend or you tell her to bring the police," then Gay told his girlfriend to hang up. *Id.*

After the call, Patel "deadlocked" Gay's room on June 1, 2020 – that is, he locked the door with a traditional (non-electronic) key so that no keycard with a magnetic strip could open the door. Tr.273-74. Even the hotel's master keycard would not work once the room was deadlocked. Tr.274. The hotel had only one copy of the deadlock key, and only Patel and his wife (a co-manager) had access to it. *Id.* Gay's property remained in Room 133, undisturbed. Tr.275-76. The hotel did not extend Gay's rental, nor did Gay's girlfriend or anyone else attempt to pay for extra days. Tr.276.

Over the next several days, hotel management called the police twice and asked them to be present for the collection of Gay's property, but they were not available. Tr.277-78. During that period, Gay's girlfriend came to the hotel and requested Gay's property (without the police), but Patel declined to let her into

the room. Tr.276-77. Another woman also came, on a different day, and asked for Gay's property, but again Patel declined. *Id.*[6]

Finally, given the start of the busy summer season, hotel management decided to clean out Room 133 on June 14, 2020, even without police presence, so the room could be rented. Tr.277. During the cleaning, Patel found a bag of bullets in a dresser drawer. Tr.277-78, 283, 286-87; Gov.Exs.11-4, 11-5. The bullets were in a clear baggie, and the baggie was inside a latex glove, with some tissue paper "like to hide it." Tr.284-88; Gov.Ex.11-5. After finding the bullets, Patel called 9-1-1. Tr.288.

In response to the 9-1-1 call, Officer Mario Mendoza of the Rock Island Police Department came to the hotel that day. Tr.361-62. He talked with the Patels, who told him that Gay's rental period had expired on June 1 and that they found the ammunition while cleaning out the room. Tr.362-63. Mendoza found the baggie of ammunition in Room 133 and took pictures of the scene. Tr.362-64; Gov.Exs.13, 11-4; 11-5; *see* Tr.245-46. Mendoza collected the ammunition and other evidence, then got evidence regarding Gay's stay from the hotel office. Tr.364-65, 370-71.

---

[6] That woman, testifying for the defense at trial, stated that when she reported to Gay that the hotel insisted on police presence to turn over his property, "[h]e told [her] to hold off on that." Tr.702.

C.    Indictment, Pretrial Proceedings, Mandamus Petition, and Mistrial

A grand jury in the Central District of Illinois returned an indictment in July 2020, charging Gay with possessing a Glock .45 caliber pistol as a felon on May 31, 2020 (Count One) and possessing .45 caliber ammunition as a felon "beginning sometime after May 11, 2020, and continuing until on or about June 14, 2020" (Count Two), both in violation of 18 U.S.C. § 922(g)(1).

1.    Gay's representation status

The court appointed numerous attorneys to represent Gay following his indictment, but Gay proved unable to work with nearly all of them. R.27; R.30; D.E. 07/15/2020; D.E. 08/27/2020; D.E. 09/02/2020; D.E. 09/14/2020. The attorneys' efforts to represent Gay were marked by accusations of ethical violations by Gay and various conflicts and complaints. *E.g.,* D.E. 09/02/2020. As a result, Gay ultimately chose to represent himself – a request the district court granted after multiple unsuccessful attempts to find even a stand-by attorney with whom Gay could work, a *Faretta* colloquy, and the court's review of a court-ordered psychiatric evaluation. R.122; D.E. 08/18/2021; D.E. 09/20/2021; D.E. 10/01/2021; D.E. 12/08/2021; D.E. 12/29/2021.

The court appointed a final attorney as stand-by counsel "for the limited purpose of facilitating discovery for the defendant" after Gay repeatedly complained about difficulty in reviewing discovery (presumably because he refused

to go to the U.S. Attorney's Office or the federal courthouse for that purpose). D.E. 01/14/2022; *see* D.E. 1/12/2022. However, the court dismissed that attorney on the first day of trial, and Gay represented himself from that point forward through both of his trials. D.E. 04/19/2022.

### 2.   Continuances

Along with his representation issues, Gay – who was on bond during the pretrial proceedings – requested at least nine continuances before his first trial. R.29; R.35; R.51; R.60; R.76; R.217; R.219; R.280; R.283.

### 3.   Speedy trial issues

The court's October 2021 order for a competency evaluation and related developments precipitated concerns regarding compliance with the Speedy Trial Act. Gay missed his initial appointment for that evaluation, and the court directed the parties to brief the effect of the resulting delay on Gay's speedy trial rights. D.E. 11/04/2021. Counsel for the government and the defense agreed that the time was excluded – and the court so found – despite Gay's own protestations to the contrary. R.128; R.130; D.E. 11/19/2021.

### 4.   Motions to suppress (ammunition charge)

Among numerous pretrial motions, Gay filed two motions to suppress the ammunition recovered from Room 133 – one through counsel and one pro se – asserting that Officer Mendoza's seizure of the ammunition violated the Fourth

Amendment. R.68; R.86. Relevant to this appeal, Gay asserted that he had a reasonable expectation of privacy in the hotel room even though his rental period ended on June 1. *Id.* Gay further claimed that Patel said he had two weeks following that date to clear the room. R.86 at 1.

The district court denied those motions after an evidentiary hearing, finding that Gay had no reasonable expectation of privacy in the hotel room as of June 14, given that "his rental agreement had expired nearly two weeks earlier." R.227 at 2; *see* R.311. Nor did Gay's phone conversation with Patel give him a reasonable expectation of privacy, since Gay acknowledged "my time is up"; he "never told [Patel] that he wanted to stay in that room beyond June 1"; and he "never paid to keep the room from June 1 through June 14." R.227 at 3-4. Contrary to Gay's claim, the court found that Patel "never told [Gay] that he had two weeks to get his belongings or that the Patels would keep his belongings in the motel room as opposed to a storage area[,]" a fact confirmed by the jail call between Gay and Patel. *Id.* And, even if he had, the court explained that Patel's entrance into the room was private and thus did not involve the Fourth Amendment. Authorities were entitled to repeat that search as long as they did not expand upon it. *Id.* "[W]here an occupancy period has concluded," the court concluded, "a hotel manager may enter the room or consent to its search." *Id.* at 4.

13

5.   Petition for writ of mandamus

Shortly before trial was to start, Gay filed a petition for writ of mandamus in this Court, asserting that the district court was abusing its discretion by declining to continue the trial for further consideration of suppression and evidentiary issues. CA7 No. 22-1648, R.1. This Court denied the petition. CA7 No. 22-1648, R.2.

6.   Mistrial

A trial was held in April 2022 but ended in a mistrial because the jury was unable to agree upon a verdict. D.E. 4/22/2022. The jury heard testimony from eight witnesses for the defense during the first trial, including the following, as relevant to this appeal:

- Officer Scott Gable of the Rock Island Police Department ("RIPD") and Dora Villarreal, the Rock Island County State's Attorney, testified regarding (1) a police encounter with Gay on May 23, 2020 (while he was staying at the American Motor Inn), during which Gable seized a "Sleep Inn" hotel keycard and other property from Gay, and (2) Gay's subsequent complaints about the RIPD. R.334 at 565-79, 592-602.

- Jason Foy, the communications supervisor and freedom of information officer for RIPD, authenticated a printout of calls for police service at 502 6th Street in Rock Island – where the May 31, 2020, encounter occurred – for a period of

about five years before and after that date. R.334 at 545-553. The court admitted that printout as a defense exhibit. R.320-1.

After the mistrial, the government indicated its intent to retry Gay, and the court initially scheduled the retrial to start on May 31, 2022. D.E. 04/22/2022.

### 7.    Pretrial conference

The court and the parties discussed the retrial at a pretrial conference on April 27, 2022. The court changed the date of the retrial to May 16, 2022, noting that the previously scheduled setting of May 31 might not allow enough time. Pretrial Tr. 2. Specifically, in light of the preceding Memorial Day holiday, the start of jury selection might have to be delayed until the afternoon of May 31, 2022, thus compressing the trial timeline. *Id*. The court, which was aware of conflicts later that spring, also noted its "speedy trial concern[.]" *Id.* at 2, 6. And the court explained that preparing for the retrial would not be complicated, particularly given that, after going through the first trial, the court and the parties would "know what it looks like." *Id.* at 2.

Gay nonetheless asked for a later trial setting, saying he intended to hire counsel and a law enforcement expert and suggesting the first trial had been a difficult experience. Pretrial Tr. 4-6. The court set the trial for May 16, 2022, but told Gay if that did not work for him, he should file a motion to continue further explaining his reasons. Pretrial Tr. 6.

In relation to the evidence to be presented, the court ruled that the prior

testimony from Officer Gable and Villarreal regarding the May 23 encounter and

Gay's complaints about the police was irrelevant and would be excluded. Pretrial

Tr. 7-8, 11.[7] In partial explanation, the court noted that no evidence during the

first trial connected the "Sleep Inn" keycard seized by Gable to the American

Motor Inn or Room 133. *Id*.

8.   Parties' pretrial motions

The parties filed several motions between the pretrial conference and the start

of the retrial, including the following:

a.   Defense motion to continue retrial

Gay filed a motion to continue the retrial, asserting that he had only recently

received transcripts from the first trial and had yet to receive certain, unspecified

documents requested from third parties. R.343 at 1-3. Gay also asserted that he

needed more time to mentally process the first trial. *Id*.

On the first day of trial, Gay elaborated upon his motion and claimed that he

had only recently received "just about everything" he requested from third

---

[7] Gay had filed a civil-rights action against the City of Rock Island and two Rock
Island police officers regarding the May 23 encounter. *Gay v. Key*, CDIL No. 20-cv-4250.
Later, in a discussion outside the presence of the jury during the retrial in this case, the
judge told Gay, "The incident on the 23rd, the activities on the 23rd, which I've deter-
mined to keep out, have to do with you wanting to retry your civil case in this
courtroom . . . ." Tr.585.

parties but had not received "all [he] asked for[.]" Tr.6, 11. The court clarified that Gay had received requested radio transmissions from Officer Costas but had not received all 9-1-1 calls made from May 1, 2020, to June 14, 2020. Tr.6. The court confirmed that Gay had received a record of a 9-1-1 call made on June 14 and speculated that perhaps that was the only call; Gay disagreed and also said he wanted to call the 9-1-1 dispatcher at trial. Tr.7-8.

Gay also suggested he was awaiting records from "Dixon" – apparently referring to an Illinois Department of Corrections warden – in relation to an employee, Dana Thompson, who reviewed with Gay the Project Safe Neighborhoods letter warning him that he was prohibited from possessing firearms. Tr.7-8, 11, 231-37, 241-44; Gov.Ex.16; *see* R.346 (ex parte motion).

Gay stated he had not finished reviewing the transcripts from the first trial. Tr.7. And he suggested that it was inconvenient for him to go to the library and the clerk's office to obtain online documents, although he had been to at least the former location and had seemingly been able to pick up exhibit copies from the latter. Tr.6, 8-10; D.E. 5/11/2022. Gay also had a home computer and repeatedly joined court hearings by video conference. *E.g.*, D.E. 03/21/2022. The government opposed the continuance. Tr.8-9.

The court denied the motion to continue. Tr.10, 12. The court noted that Gay had received transcripts at the same time as the government, which Gay

17

conceded, stating, "I can deal with that." Tr.10. Any difficulty in obtaining documents online at his home that required Gay to walk to the library or clerk's office was in part due to Gay's "choice by deciding to represent [him]self." Tr.9-12. As to the 9-1-1 calls, the court assured Gay that prior to the defense case-in-chief, they would "get to the bottom . . . to see if there [were] any other transmissions from the 911 calls." Tr.11. Finally, the court did not see the relevance of the Dixon materials (nor has Gay explained their relevance on appeal), but nonetheless stated that their relevance could be discussed at a later time. Tr.11-12. At trial, Gay's eventual cross-examination of Thompson was limited to her confirmation that he had been housed in a psychiatric unit. Tr.243-44.

      b.  Defense motion to reconsider order excluding testimony

Gay also filed a motion to reconsider the court's order excluding the testimony of Gable and Villareal regarding the May 23 encounter. R.312. Gay asserted that the officers "battered and robbed" him, thus (he alleged) explaining why he did not want to involve the police in the retrieval of his property from the American Motor Inn. *Id.* The court denied the motion to reconsider during a motions hearing on May 9, 2022, stating that it still believed the testimony would be irrelevant. Motion Tr. 19.

  c. Government's motion to exclude evidence

The government filed a motion to exclude evidence regarding the five years of police service calls at the 6th Street address where Gay fled police. R.320. The motion also noted that Jason Foy had "no . . . relevant evidence to provide" other than as the department's freedom of information officer, and asked that Foy "be released from any subpoena." *Id.* at 4. The court granted the government's motion in part and denied it in part, ruling that Gay could elicit evidence regarding police calls for "a few months" before and after the May 2020 incident to "explore that [it] was a high crime area, and that the gun could have been left there by someone else," but that police calls outside that period were irrelevant. Motion Tr. 35-43.

On the first day of trial, the court ruled that Foy's testimony regarding criminal activity in the area would not be required, amid numerous invectives from Gay. D.E. 05/16/2022; *e.g.,* Tr.32 (noting he wanted the government's witnesses "to suffer"). The court later explained that Foy's testimony was not necessary given the presence of other witnesses, specifically citing Detective Gregory Whitcomb of the Rock Island Police Department ("RIPD") as a source of information, and the possibility of a government stipulation on the area's crime rate. Tr.24, 495-96.

19

D.  Trial Proceedings

1.  Testimony and other evidence

The retrial was held in May 2022 and lasted three days, with a jury verdict on the fourth day. Gay represented himself throughout. The jury heard testimony from Officers Costas, Sailor, and Mendoza; Detective Whitcomb (who was also a special deputy with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF")); an ATF forensic biologist; a forensic investigator with RIPD; an ATF special agent; the Rock Island County Sheriff's Office systems administrator; two employees and a former employee of the Illinois Department of Corrections ("IDOC"), including Gay's parole officer; Pritesh and Kalpanaben Patel, the managers of the American Motor Inn; and the woman (not Gay's girlfriend) who requested Gay's property at the hotel. The last two witnesses – Kalpanaben Patel and the woman who sought Gay's property – testified for the defense.

The IDOC employees and former employee testified regarding Gay's prior offenses and parole status, as described above.[8] The police officers and the hotel managers testified regarding the offense conduct described above. And the Sheriff's Office systems administrator testified regarding the recording of Gay's three-way call from the jail. The jury also saw the dashcam video from the patrol

---

[8] Gay declined to stipulate to his status as a felon or his knowledge of that status. Motion Tr. 25.

car, Sailor's bodycam video, and Mendoza's bodycam video. Tr.96, 142-46, 151-66, 367-72.

In addition to the prior offenses and offense conduct described above, the jury heard testimony and saw evidence on the following:

    a.   Hotel guest keycards and Gay's keycard(s)

Pritesh Patel testified that the American Motor Inn used keycards with magnetic strips for guests to access their rooms. Tr.256-57. During May and June 2020, the hotel's guest keycards did not show the name of the hotel. Tr.321-22, 336. Rather, each keycard showed either Domino's Pizza (as an advertisement) or Sleep Inn (which another hotel had given to the American Motor Inn). Tr.256, 336-37. Thus, anyone encountering a keycard from the American Motor Inn would not have known that it came from that hotel, nor which room it would open. Tr.301-02, 321-22, 336.

When a guest checked in for a one-week stay, he received a keycard programmed to open his assigned room for that one-week period. Tr.257. Once that period expired, the keycard automatically deactivated. Tr.257, 347. If the guest renewed his stay for another week, the hotel could either reprogram the old keycard or provide a new card. Tr.257-58, 347. The hotel could reprogram a keycard only by having physical possession of it; they could not do it remotely. Tr.257. If a guest reported losing his key, the hotel provided a new keycard

programmed for his room. Tr.258. And if the hotel programmed a new card for a given room, any other card previously programmed for that room was automatically deactivated. Tr.257-60, 346. The hotel never gave a keycard programmed for a given room to anyone other than the guest staying there. Tr.321.

Patel further testified that Gay initially checked in to the hotel for a one-week stay on May 11, 2020. Tr.249-52. On May 18, he asked to stay another week, and the hotel either reprogrammed his keycard or gave him a new card programmed for Room 133. Tr.255-57, 334-35. A similar transaction occurred on May 25, renewing Gay's stay until June 1. Tr.259-60, 335-36.

Detective Whitcomb testified that during an unrelated incident on May 23, 2020, the police seized a "Sleep Inn" magnetic keycard from Gay. Tr.605-06. The card was placed in a sealed envelope and logged into the RIPD evidence system on May 23. Tr.607-09. The card and envelope remained in evidence storage from that date until May 2021, and the seal on the envelope was first broken about a month before the retrial in this case. Tr.608-09.

Patel testified, finally, that the "Sleep Inn" keycard seized from Gay on May 23 – assuming it came from the American Motor Inn – would no longer have worked as of May 25, 2020. Tr.337, 346. Patel did not remember (and no records indicated) whether the hotel programmed a new keycard for Gay between May 23 and May 25. Tr.335.

b.  Analysis of the gun and ammunition

The jury also heard testimony and saw evidence regarding the examination of the Glock recovered from Gay's flight path on May 31, the ammunition contained in the Glock's magazine, and the ammunition retrieved from the hotel room on June 14.

(1)  Characteristics of the gun and ammunition

Detective Whitcomb testified that the Glock, as recovered on May 31, contained five live rounds in the magazine: two Winchester .45 Auto full-metal jacket rounds with brass casings, and three SIG Sauer .45 Auto jacketed hollow-point rounds with nickel casings. Tr.532-34, 563-64, 618; Gov.Exs.12-1, 12-2, 12-4, 12-5. The Winchester rounds had brass primers (the smaller round circle on the bottom of each casing), and the SIG Sauer rounds had nickel primers. Tr.664-65. Two of the rounds contained in the Glock's magazine upon seizure – one Winchester and one SIG Sauer – were used in test-firing the gun on June 1, 2020, for purposes of adding images of the spent casings to the National Integrative Ballistic Information Network. Tr.523-24, 528-31, 534-37; *see* Tr.417. Thus, three unfired rounds from the Glock's magazine – one Winchester and two SIG Sauers – remained after the test-firing. Tr.561-63.

Government Exhibit 12-4[9]



Government Exhibit 12-5



After Officer Mendoza retrieved the baggie of unfired rounds from Room 133,

Whitcomb compared those rounds to the remaining rounds from the Glock's

magazine. Tr.550-52. The rounds recovered from the hotel room consisted of

fourteen Winchester .45 Auto full-metal jacket rounds with brass casings, one

---

[9] The pictured government exhibits have been cropped to eliminate irrelevant
material.

SIG Sauer .45 Auto jacketed hollow-point round with nickel casing, and one Armscor .45 Auto round with brass casing. Tr.564-65; Gov.Exs.12-6, 12-7, 12-10. The Winchester rounds had brass primers, and the SIG Sauer round had a nickel primer. Tr.670-72. Thus, the rounds from the hotel room – except the Armscor round – were of the same manufacturer, caliber, bullet type, casing type, and primer type as the rounds from Gay's gun. Tr.664-73, 677-78.

Government Exhibit 12-7

Government Exhibit 12-10



2020-5288 Ammunition from hotel room

Additionally, the ATF agent testified that ammunition manufacturers use different fonts and spacing for the "head stamps" on their products – that is, the figures on the bottom of each casing – even within a given caliber. Tr.659-60. Nonetheless, the head stamps on the rounds from Gay's gun were identical to the head stamps on the rounds from the hotel room.  Tr.671-73. The rounds from the hotel room thus matched the rounds recovered from the Glock. Tr.547-48, 552, 565, 631-32, 634.

(2)  Fingerprints and DNA

The Rock Island forensic investigator testified that he checked the Glock and the ammunition for latent fingerprints, but found no fingerprints suitable for comparison. Tr.435-36. He testified that several factors can affect whether suitable fingerprints can be recovered from firearms and ammunition, including the type of surface, how the item was handled, the condition of the user's hands

26

(moist or dirty), and the environment to which the item is exposed after touching (such as being held in a waistband). Tr.420-26, 429-30. It is "very common" to be unable to secure suitable fingerprints from firearms and ammunition. Tr.426-27. In particular, it is "very, very difficult to recover latent prints" from Glock firearms, due to the textured and plastic materials from which they are made. Tr.427-28, 433, 436. And "[a]mmunition is very difficult for latent print recovery, even worse than firearms due to their small size" and their shape. Tr.430. Indeed, the investigator had never recovered a suitable latent fingerprint from ammunition during his "entire" nine-year career. Tr.416, 430.

Finally, the ATF forensic biologist testified that he tested swabs taken from the Glock for DNA evidence, but recovered no DNA suitable for comparison. Tr. 79-84; *see* Tr.609-10. Although he recovered partial DNA profiles, there was insufficient material to include or exclude any person as the contributor. Tr.485-86.

      c.   Other matters

Gay's parole officer testified that, upon release from state prison in 2018 until the conclusion of his supervised release in July 2020, Gay was required to live at his parents' home in Rock Island and to obtain his parole agent's permission before changing residence. Tr.404, Gov.Ex.16 at 1, 3. Gay, who was unemployed during parole, never reported to his parole officer that he was living at the

American Motor Inn, which was about two miles from his parents' home. Tr.403, 406.

Patel additionally testified that during his parole Gay had stayed at the hotel on four occasions, with stays ranging from one night to 103 nights. Tr.265. Gay also came to the hotel on June 24, 2020 (after his release from jail), and collected the rest of his property. Tr.291-92. Gay did not complain that any of his property was missing. Tr.313. Gay spent one night at the hotel a few days later, on June 28, 2020. Tr.296; Gov.Ex.15-2. He stayed in the same room as before – Room 133 – but Patel did not remember at trial whether Gay specifically requested that room or whether the hotel simply happened to give it to him. Tr.296, 313-14.

### 2.   Trial motions

At the close of the government's case, the defendant moved for judgment of acquittal – related only to Count One, possession of a firearm – and the court denied the motion. Tr.684-87; R.348. After his own witnesses, Gay "renew[ed]" his motion, and the court again denied it. Tr.738.

### 3.   Jury deliberation and verdict

The jury returned verdicts of guilty on both counts after deliberating for about an hour and a half. Tr.795-97, 801-03; R.349.

E. Gay's post-trial motions

Shortly after trial, attorney Jennifer Soble entered her appearance on Gay's behalf. R.358. She represented Gay through sentencing.

1. "Consolidated post-trial motions"

In October 2022 – about five months after trial – the defense filed "Anthony Gay's Consolidated Post-Trial Motions." R.403. Gay (1) moved for judgment of acquittal, asserting that the evidence did not support his guilty verdict "as to either count"; (2) moved for a new trial, in part alleging that the court abused its discretion in not allowing additional testimony regarding Gay's encounter with the police on May 23, 2020, and in not allowing him to call Jason Foy, the freedom of information officer, to establish that the May 31 incident occurred in a "high crime area"; and (3) moved to dismiss the indictment on the basis that Section 922(g)(1) was unconstitutional in light of *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). R.403 at 1-16.

The court denied Gay's motions. R.412. On the motion for judgment of acquittal, the court found that the jury heard "plenty" of evidence to find Gay guilty, notwithstanding his argument that "no witness saw him with a firearm or ammunition and no forensic evidence connected him to the same." *Id.* at 2. On the motion for new trial, the court found that Gay was not deprived of a fair trial in that the jury heard testimony that the police seized a hotel keycard from him

on May 23; further testimony on that encounter would have (improperly) allow-ed Gay to try his civil claims on that subject during his criminal trial (*see supra* note 7); and Gay could have elicited testimony from Detective Whitcomb about the nature of the area where the May 31 incident occurred, but "chose not to." *Id.* at 3. And on the claim of unconstitutionality, the court noted in part that *Bruen* confirmed that the right to bear arms is limited to "law abiding, responsible citizens." *Id.* at 4 (citing *Bruen*, 597 U.S. at 8).

2. Motion for new trial ("newly discovered evidence")

Finally, on May 19, 2023 – an entire year after the retrial, days before the scheduled sentencing hearing, and only shortly after the court denied a motion to continue sentencing – Gay filed a motion for new trial with an affidavit from a "video expert" stating (1) that he had "slowed and enhanced" the footage from Officer Sailor's bodycam showing Sailor leading Gay back to the patrol car, and (2) that "[t]here [did] not appear to be a gun on the ground next to the garage where the gun [was] later found." R.428. Describing his "enhancement" of the video, the affiant said he "brightened and increased contrast." *Id.* The affidavit was dated about five months before the filing for the new-trial motion: January 23, 2023. R.428-1. The motion asserted that the affidavit constituted "newly discovered evidence because Mr. Gay did not have time to procure such expert testimony between his first trial and second trial." R.428 at 1. No corresponding,

slowed video footage or screenshots were ever provided to the court or the government.

The court denied the motion on the first day of sentencing. Sent.Tr.14-15. The court found that the bodycam video "[had] been available from the beginning of discovery for review by parties and experts if the parties had chosen to consult with one." *Id.* at 14. The affiant's opinion went to "the credibility of the officers involved," and "Gay was given every opportunity to challenge the credibility of the witnesses" during cross-examination. *Id.* at 14-15.

F.   Sentencing and Judgment

The presentence report listed Gay's prior convictions, as summarized above. PSR ¶¶57-75. Gay's robbery conviction involved an incident in which, one day after his release from prison, Gay "picked up" a fifteen-year-old boy and "threw him down on the pavement[,]" and Gay and fellow Gangster Disciples members struck him, resulting in injuries to his face, and took the boy's "hat and one-dollar bill." PSR ¶58. The presentence report also described each of Gay's many convictions for aggravated battery of a corrections officer, which involved actions including headbutting, hitting, and throwing human waste. *Id.* ¶¶59-75.

The court held a two-day sentencing hearing. R.427; R.429. The court sentenced Gay to a low-end Guidelines sentence of eighty-four months in prison on

each count, to run concurrently. Sent.Tr.360-66. The court entered judgment on May 25, 2023. R.436.

G.  Appeal

Gay filed a timely notice of appeal on May 31, 2023. R.440.

## SUMMARY OF THE ARGUMENT

Gay makes the following claims on appeal: (1) that the district court abused its discretion in denying his motion to continue his retrial; (2) that the jury's guilty verdicts were not supported by sufficient evidence; (3) that the court erred in denying his motion to suppress; (4) that the court abused its discretion in excluding certain evidence; (5) that the district court abused its discretion in denying his post-trial motion for a new trial based on newly discovered evidence; and (6-) in the alternative, that 18 U.S.C. § 922(g)(1) violates the Second Amendment in light of *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022).

Each of Gay's claims is without merit.

# ARGUMENT

## I. Ample Evidence Supported The Jury's Guilty Verdicts

### A. Legal Framework and Standard of Review

Where the defendant moved for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure both at the conclusion of the government's case and at the close of all the evidence, this Court reviews the sufficiency of the evidence de novo. *United States v. Hidalgo-Sanchez*, 29 F.4th 915 (7th Cir. 2022). Practically speaking, the review is for sufficiency of the evidence. *United States v. Fitzpatrick*, 32 F.4th 644 (7th Cir. 2022).

The defendant's burden in challenging sufficiency of the evidence is "nearly insurmountable." *Hidalgo-Sanchez*, 29 F.4th at 924. The Court "will overturn a verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could have found guilt beyond a reasonable doubt." *United States v. Norwood*, 982 F.3d 1032, 1039 (7th Cir. 2020). This Court will "neither reweigh the evidence nor reassess witness credibility." *United States v. Farmer*, 38 F.4th 591, 602 (7th Cir. 2022).

This Court reviews unpreserved challenges only for plain error. *United States v. Wright*, 85 F.4th 851 (7th Cir. 2023). To prevail, a defendant must show that "the record is devoid of evidence pointing to guilt, or [that] the evidence on a key

element of the offense was so tenuous that a conviction would be shocking."
*United States v. Lundberg*, 990 F.3d 1087, 1095 (7th Cir. 2021).

B.   Analysis

Gay's motion for judgment of acquittal at the close of the government's case
related only to the firearm count, and his "renewed" motion at the close of all the
evidence necessarily bore the same limitation. R.348; Tr.738. His counseled post-
trial motion, which purportedly extended to both counts, was not sufficient to
preserve the issue as to the ammunition count, such that review is for plain error.
R.403; *see Hidalgo-Sanchez*, 29 F.4th at 924. Regardless, ample evidence supported
the jury's verdict on both counts.

1.   The evidence was more than sufficient to support the verdict
on both counts

Late in the evening on May 30, 2020, Gay spotted Officers Costas and Sailor,
in uniform, in an unmarked patrol car. Tr.77, 112, 85-86, 128. About an hour later,
Gay was a passenger in a car that sped away from that patrol car. Tr.82-83. Gay
then fled from the subsequent traffic stop. Tr.84-85. Costas saw Gay reach toward
his waistband, and Sailor noticed that Gay was running "hunched over" without
swinging his arms, "as if he probably was like holding something," potentially a
weapon. Tr.84-85, 92-93, 117-19. Gay continued running despite repeated
commands to stop. Tr.84-85, 118-19.

Soon after Gay rounded the corner of the garage, fell, and got up again, he finally surrendered. Tr.120-26. As Sailor – out of breath from the chase – walked Gay toward the patrol car, he focused on communicating with other officers over the radio and safety issues, as Gay was jerking forward and yelling. Gov.Ex.5, 12:03:59-12:04:12 a.m.; Tr.154.

After managing that outburst and securing Gay in the patrol car, Sailor and another officer retraced the flight path. Right at the point where Gay had fallen, near the corner of the garage, the officers found the Glock, perfectly clean and dry. Tr.130-31; Gov.Exs.3-5, 3-7. Altogether, these facts amply supported the jury's finding that Gay possessed a firearm. The jury easily could have inferred that Gay stopped running because he no longer had the gun; that his movement and yelling as he and Sailor approached the garage were intended to distract the officer from seeing the gun; and that the gun's condition supported a finding that it had rested there for only a few minutes.

The ammunition found in Room 133 underscored the finding that Gay possessed the Glock. As described at trial, the Glock was loaded with two Winchester .45 Auto full-metal jacket rounds with brass casings, and three SIG Sauer .45 Auto jacketed hollow-point rounds with nickel casings. Tr.532-34, 563-64; Gov.Exs.12-4, 12-5. The Winchester rounds had brass primers, and the SIG Sauer rounds had nickel primers. Tr.664-65. Fifteen rounds of the very same kind of

ammunition – with identical head stamps – were found in the hotel room rented by Gay. Tr.552, 565, 634, 671-73; Gov.Exs.12-7, 12-10. Along with the circumstances on the night the gun was found, the presence of the same ammunition in the hotel room provides strong support for the conclusion that Gay dropped (or discarded) the gun.[10]

By the same token, the evidence at trial amply supported the jury's finding that Gay possessed the ammunition. Gay checked in to Room 133 on May 11. Tr.249-59. The hotel had cleaned that room beforehand and checked it for any property left behind by any prior guest. Tr.275, 320. Only Gay had a working guest keycard for Room 133. Tr.257-60, 321, 346-47. Hotel management knew that Gay was very particular about not letting anyone else enter his room. Tr.263-64.

Gay called the hotel from jail on June 1, anxious to remove his property from the room without police involvement. Tr.261-62; Gov.Exs.14, 14-1a. The hotel declined to let anyone into Room 133, and "deadlocked" the room after that call with a traditional key, so that no magnetic keycard (even the hotel's master keycard) could open the room. Tr.261-62, 273-74; Gov.Exs.14, 14-1a. Two people came on separate occasions over the next two weeks seeking Gay's property, but

---

[10] Gay faults the government for using evidence of the ammunition to help support the firearm charge, and vice versa. Def.Br.21. But this Court has frequently done so. *E.g.*, *United States v. Howell*, 958 F.3d 589, 603 (7th Cir. 2020).

the hotel declined to let them in without a police presence to witness the transfer of property. Tr.276-77.

Finally, on June 14, the hotel management decided to remove Gay's property so they could rent the room. Tr.277. All of the evidence indicated that Gay's property had remained undisturbed in the interim. While cleaning out the room, one of the managers found, among Gay's other belongings, a baggie of unfired rounds hidden in a latex glove inside a drawer. Tr.283-88; Gov.Ex.11-5. The jury thus had ample evidence to conclude that Gay's eagerness to retrieve his property – without police involvement – was motivated in part by the presence of the bullets. And the jury could have inferred that Gay's possession of the ammunition partly explained his failure to notify his parole officer regarding his change of address. Tr.406.

Far from there being "no evidence" to support the jury's verdict, *Norwood*, 982 F.3d at 1039, there is abundant evidence, especially viewing that evidence "in the light most favorable to the government," *United States v. Anderson*, 988 F.3d 420, 424 (7th Cir. 2021). Gay cannot satisfy his "high" burden on this challenge, *Fitzpatrick*, 32 F.4th at 649, nor his "even higher" burden in relation to the ammunition count, since he failed to preserve that challenge, *Wright*, 85 F.4th at 860.

2. Gay's arguments to the contrary are without merit

Gay's arguments to the contrary are unconvincing. In short, Gay objects that the government's case was merely "circumstantial." Def.Br.1-2, 17-18.

As this Court has said in assessing sufficiency-of-the-evidence challenges, "popular misconceptions aside, circumstantial evidence is no less probative of guilt than direct evidence. . . . A defendant need not be caught red-handed in order to satisfy the possession element." *United States v. Starks*, 309 F.3d 1017, 1021-22 (7th Cir. 2002). "Indeed, in some cases circumstantial evidence is even more reliable." *Id.* (cleaned up). "[T]he trier of fact is entitled to employ common sense in making reasonable inferences from circumstantial evidence." *Id.* at 1021-22; *see United States v. Lawrence*, 788 F.3d 234, 240 (7th Cir. 2015) ("All forms of possession can be proved by direct or circumstantial evidence.").

This Court has frequently upheld convictions for possession of weapons or drugs based on circumstantial evidence. *United States v. Kelly*, 519 F.3d 355, 361 (7th Cir. 2008) ("Of course, possession can be shown through circumstantial as well as direct evidence."). In *United States v. McNeal*, for example, the Court affirmed a felon-in-possession conviction where an officer saw the defendant speed away from a shooting, then found a recently fired handgun in the car. 900 F.2d 119 (7th Cir. 1990). McNeal "argue[d] that the government never proved that he knew the gun was there, or that he ever intended to exercise dominion

and control over the gun," but the Court held that "circumstantial evidence is sufficient to establish the element of knowing possession." *Id.* And even aside from actual possession, "the government may prove *constructive* possession if it can show that the defendant exercised ownership, dominion, authority, or control over the illicit material." *Starks*, 309 F.3d at 1022 (emphasis added).

The evidence in this case is even stronger, supporting a finding of actual possession of the Glock, as well as both actual and constructive possession of the ammunition. The jury thus reasonably inferred from the evidence that Gay possessed the gun and the ammunition, and that Gay exercised "dominion, authority, [and] control" over the hotel room where the bullets were found. *See Starks*, 309 F.3d at 1022.

In arguing to the contrary, Gay relies on the fact that Sailor first saw the gun when he retraced his steps following the chase and had not noticed it while he walked Gay to the patrol car. Def.Br.18, 26. But Gay ignores the salient circumstances: The incident occurred shortly after midnight in a backyard; Sailor had just apprehended a suspect after a chase; Gay resisted being handcuffed; Sailor was out of breath; Sailor communicated his status to the officers by radio as they walked; and the suspect began swearing and jerking forward just as they approached the point where the pistol lay, prompting Sailor to say, "Be still. Just calm down." Gov.Ex.5, 12:03:59-12:04:12 a.m.; Tr.154. Further, Sailor testified that

he was not even looking for a gun at that point. Tr.153. Under these circumstances, it is unsurprising that Sailor did not immediately notice the black gun on the ground in the dark.

Gay also asserts that Sailor's bodycam video – which the jury reviewed – did not show the moment of Gay's fall or the Glock on the ground. Def.Br.18-19, 25. Again, this argument ignores the circumstances: Sailor was running behind Gay, so Gay rounded the corner of the garage and reached the point of his fall before Sailor. Tr.118-19. Further, Sailor's running caused the image from his bodycam to bounce around. Tr.152. And as Sailor and Gay walked back toward the patrol car, Sailor's bodycam was pointed forward rather than toward the ground, which, along with the lack of lighting, renders the video inconclusive as to whether a gun lay on the ground at that point.

Further, in relation to the ammunition charge, Gay argues that the seizure of his "Sleep Inn" keycard on May 23 gave the police access to Room 133 at the American Motor Inn – presumably implying that the police put the baggie of sixteen bullets in the dresser drawer. Def.Br.36. No evidence supports the theory that the evidence was planted, though. To the contrary, the evidence showed that the keycard (which was labeled for a different hotel) was deactivated no later than May 25 and that the room was "deadlocked" on June 1. Nor did any evidence suggest the police had any idea the keycard came from the American Motor

Inn (assuming it did). Further, for Gay's theory to be believable, the police would have needed to know the proper caliber, manufacturers, and types of ammunition to "plant" in Room 133, a residence that the defendant hid from his parole officer. No evidence suggested the police knew about the room, either, and they initially declined two opportunities to go to the hotel and witness management's clean-out. Tr.277-78.

Finally, contrary to Gay's argument, the lack of fingerprint and DNA evidence does not undercut the jury's findings. As the forensic investigator testified, it is "very common" to be unable to secure suitable fingerprints from firearms and ammunition, and recovering suitable prints from Glock firearms is especially difficult given their composition and texturing. Tr.426-28, 433, 436. Moreover, the investigator had never secured a suitable fingerprint from ammunition during his entire career. Tr.416, 430. And neither the Glock nor the ammunition bore suitable fingerprints or DNA from *any* person – neither Gay nor anyone else. Tr.435-36, 485-86.

### 3. Gay is not entitled to a new trial

For the same reasons, Gay is not entitled to a new trial in the interest of justice based on his allegation that the record places the correctness of the jury's verdicts in doubt. Def.Br.22-26; *see* Fed. R. Crim. P. 33. First, Gay failed to make

this claim below, and has therefore waived or at a minimum forfeited it. Second,

it does not hold water given the strength of the evidence described above.

II.  The District Court Correctly Denied Gay's Motion To Suppress

   A.  Standard of Review

   "When reviewing the denial of a motion to suppress[,]" this Court reviews "legal questions de novo and factual findings for clear error." *United States v. Mosby*, 541 F.3d 764, 767 (7th Cir. 2008).

   B.  Legal Framework

   "The question of whether a search is reasonable pursuant to the Fourth Amendment turns in large part on the extent of a defendant's legitimate expectations of privacy." *United States v. Procknow*, 784 F.3d 421, 425-26 (7th Cir. 2015) (cleaned up). In relation to a hotel room, "Fourth Amendment protection . . . is dependent on the right to private occupancy of the room." *Id.* "[A]t the conclusion of the rental period," for example, "the guest has completely lost his right to use the room and any privacy associated with it" and "the hotel manager may enter the room or consent to its search." *Id.*

   Additionally, even where a person retains a legitimate expectation of privacy over certain premises, "a warrantless search may still be permissible if consent is obtained from a third-party with apparent authority. When determining whether an individual has apparent authority to consent, [this Court] employs an objective standard; officers may conduct a search without a warrant if they reasonably

(though erroneously) believe that the person consenting had authority over the premises." *United States v. Richards*, 741 F.3d 843, 850 (7th Cir. 2014) (cleaned up).

Also relevant here, "parolees . . . have severely diminished expectations of privacy by virtue of their status alone." *Samson v. California*, 547 U.S. 843, 850-52 (2006). When Gay's state parole began in 2018, Illinois law required him, among other things, to report to his parole officer and to permit the officer to visit him at home or work; to get permission before moving; and to "consent to a search of his or her person, property, or residence under his or her control." 730 Ill. Comp. Stat. Ann. 5/3-3-7(a) (West 2018). *Cf. Samson*, 547 U.S. at 851-52 (describing similar provisions of California law). Moreover, as this Court has observed, "[t]hose reduced expectations are diminished further where . . . a condition of parole requires the parolee to submit – unconditionally – to searches of his person, property, and residence." *United States v. White*, 781 F.3d 858, 863 (7th Cir. 2015). Thus, in *White*, the Court affirmed the denial of a parolee's motion to suppress the results of a warrantless search of his gym bag where the parolee was subject to a similar agreement to Gay. 781 F.3d at 859-60.

C.   Analysis

The district court properly denied Gay's motion to suppress. Most importantly, Gay no longer had a "legitimate expectation[ ] of privacy" in the hotel room as of June 14, 2020, when Officer Mendoza entered the room and

retrieved the unfired rounds. *Procknow*, 784 F.3d at 425-26. As the district court found, Gay's rental agreement expired on June 1; he acknowledged "my time is up" in the phone call with Patel on that day; he "never told [Patel] that he wanted to stay in [the] room beyond June 1"; and he "never paid to keep the room from June 1 through June 14." R.227 at 2-3. The court further found that Patel never told Gay he had an additional two weeks to keep his possessions in the room (a finding that is also supported by their recorded call). R.227 at 3. Additionally, in his objections to the presentence report, Gay acknowledged that his "rental ended on June 1, 2020." PSR at 48. Thus, as of June 14, Gay had "completely lost his right to use the room and any privacy associated with it," and "the hotel manager [could] enter the room [and] consent to its search." *Procknow*, 784 F.3d at 425-26.

Gay asserts on appeal that Mr. Patel gave him "an additional two weeks [beginning on June 1] to leave his property in the room" – thus allegedly giving him a reasonable expectation of privacy in Room 133 through June 15. Def.Br.31-33. Gay does not overcome the clear-error standard of review as to the district court's contrary factual finding. Moreover, Patel directly contradicted that assertion, stating that he did not extend Gay's rental beyond June 1 and, in fact, would have been unable to do so without payment. R.311 at 69, 71, 73. Furthermore, Patel suggested that to the extent Gay's property would remain

available to him, it would be in storage, not in the hotel room. *Id.* at 93. And, as explained above, the hotel deadlocked Room 133 on June 1, so Gay could not have entered the room after that date even if he had a properly activated cardkey (which he did not). *Id.* at 73, 81-82, 122.

Moreover, Officer Mendoza also reasonably relied on the hotel managers' apparent authority to consent to his entry. *Richards*, 741 F.3d at 850. The Patels told Mendoza that Gay's rental period had expired on June 1, and he saw them use a traditional key, rather than a keycard, to open the room. Tr.362-63.

Gay's parole status further supports the court's denial of his motion to suppress, given his "severely diminished expectations of privacy." *Samson*, 547 U.S. at 850-52. Gay expressly stated, in his parole agreement, that he would "consent to a search of [his] person, property, or residence." Gov.Ex.16 at 3. Gay was still on parole as of June 14, 2020. *Id.* at 2. Like the search of the gym bag in *White*, therefore, that consent justified the officer's entry into Room 133 and his seizure of the ammunition – even assuming it was still Gay's hotel room (which it was not).

III. The District Court Acted Well Within Its Discretion In Excluding
Certain Evidence

   A.   Legal Framework and Standard of Review

   Although the Constitution guarantees "'a meaningful opportunity to present

a complete defense,' [that] right does not permit a criminal defendant to admit

any and all evidence." *Hinkle v. Neal*, 51 F.4th 234, 241 (7th Cir. 2022) (quoting

*Crane v. Kentucky*, 476 U.S. 683, 690 (1986)). Most fundamentally, "[i]rrelevant

evidence is not admissible." Fed. R. Evid. 402. Further, a court may exclude even

relevant evidence "if its probative value is substantially outweighed by a danger

of . . . confusing the issues, misleading the jury, undue delay, wasting time, or

needlessly presenting cumulative evidence." Fed. R. Evid. 403. This is especially

true if the evidence is "only marginally relevant." *Holmes v. South Carolina*, 547

U.S. 319, 326 (2006). Rule 403 "calls for a balancing that requires an exercise of

discretion that is best performed in the first instance by the district court."

*Sanchez v. City of Chicago*, 880 F.3d 349, 359 (7th Cir. 2018).

   Thus, this Court gives "special deference" to such evidentiary rulings by the

trial court, reversing "only if no reasonable person could take the judge's view of

the matter." *United States v. Pulliam*, 973 F.3d 775, 782 (7th Cir. 2020) (cleaned up).

"A determination made by a district court judge regarding the admissibility of

evidence is treated with great deference because of the trial judge's first-hand

exposure to the witnesses and the evidence as a whole, and because of his

familiarity with the case and ability to gauge the likely impact of the evidence in

the context [of] the entire proceeding." *United States v. Wash*, 231 F.3d 366, 371

(7th Cir. 2000) (cleaned up). "And even if the district court erred in excluding

evidence, a new trial is warranted only if the error has a substantial and injurious

effect or influence on the determination of a jury and the result is inconsistent

with substantial justice." *Arrigo v. Link*, 836 F.3d 787, 794 (7th Cir. 2016) (cleaned

up).

   B.   The Exclusion of Additional Evidence Regarding the Police Encounter
        of May 23 Was Within the Court's Discretion

   Gay argues, first, that the district court erred in excluding testimony by

Officer Scott Gable of the Rock Island Police Department and Dora Villarreal, the

Rock Island County State's Attorney. Def.Br. 38-41. Gable and Villareal testified

during the first trial regarding Gay's encounter with the police on May 23, 2020,

when the police seized a "Sleep Inn" hotel keycard and other property, and

regarding Gay's subsequent complaints about the police. R.334 at 565-79,

592-602. Gay argues that their testimony would have shown "potential animus

against [him] by the [RIPD]" and would have "explain[ed]" his motivation for

fleeing from the "pretextual" traffic stop on May 31. Def.Br.39-40.

   Excluding this evidence was well within the district court's discretion. The

evidence was entirely irrelevant to whether Gay possessed the Glock on May 31

or the ammunition found in Room 133. Moreover, a negative encounter with the

police on May 23 would not have justified Gay's flight from the traffic stop on May 31 and flouting of police commands to stop. And Gay's complaints about officers at the May 23 encounter would not have justified an inference that the different officers involved in the May 31 traffic stop falsely accused him merely out of "animus."

Further, the court permitted evidence regarding the seizure of the "Sleep Inn" hotel keycard, allowing Gay to argue that the police used the card to enter the hotel room. Tr.605-09. In any event, the presentation of additional evidence regarding the May 23 encounter – particularly given that the same evidence was involved in Gay's pending civil-rights action – would have created a significant risk of "confusing the issues" and "wasting time," especially in light of the extensive and competing factual claims surrounding those events. Fed. R. Evid. 403. As the district court noted, it had a significant interest in declining to permit Gay to try his civil case in the midst of his criminal trial. *See supra* note 7. Finally, the court's exposure to the testimony of Gable and Villarreal during the first trial strengthened its "ability to gauge the likely impact of the evidence in the context [of] the entire proceeding." *Wash*, 231 F.3d at 3371.

C. The Exclusion of Jason Foy's Testimony Was Within the Court's Discretion

Gay also argues that the district court erred in excluding testimony by Jason Foy, the freedom of information officer for the RIPD, regarding calls for police

service at the 6th Street address. Def.Br.41-45. Gay argues that he needed Foy's testimony to "support[ ] an alternative explanation for the gun recovered on May 31" – that is, that the Glock could have been there "for other reasons." Def.Br.41. He asserts that the exclusion of Foy's testimony "precluded [him] from introducing a plausible alternate explanation for the location of the gun." Def.Br.45.

Gay cannot show any abuse of discretion in relation to Foy's testimony, for at least two reasons. First, the district court *permitted* Gay to elicit testimony regarding police service calls at the 6th Street address for a reasonable period before and after the May 31 incident. Motion Tr. 39-43. During the first trial, Gay used Foy to authenticate a printout of service calls for a five-year period. R.334 at 545-553; R.320-1. During the retrial, however, Gay had several options for securing evidence on that subject (to the extent it may have been relevant): As the court suggested to Gay in excluding the evidence and observed in denying Gay's consolidated post-trial motions, he could have asked Detective Whitcomb – who testified on the third day of the retrial – about other police service calls to that location, but he chose not to do so. Tr.495-96; R.412 at 3. Alternatively, Gay could have sought to explore that subject with any of the other three Rock Island police officers – Zachary Costas, Quentin Sailor, or Mario Mendoza – who testified. In light of these options, Gay's insistence on calling Foy apparently had more to do with his stated desire to call multiple government witnesses from Rock Island to

testify in Peoria, Illinois, so that they could sit in the courthouse and "suffer" (Tr.31-33), than with obtaining information that only Foy could provide. And assuming the court erred at all in not permitting live trial testimony by Foy during the retrial, the error was clearly harmless. *United States v. Dvorkin*, 799 F.3d 867, 884 (7th Cir. 2015) ("Evidentiary errors are subject to harmless error review.") (cleaned up).

Relatedly, evidence regarding five years of police service calls at the 6th Street location would have risked "confusing the issues, misleading the jury, [and] wasting time." Fed. R. Evid. 403. The number of service calls at that location in August 2018, for example, would have very little bearing on the likelihood of an "alternative explanation" for the pistol recovered along Gay's flight path in May 2020. Moreover, the *nature* of the service calls listed in the printout admitted during the first trial further shows their irrelevance and the potential for misleading the jury and wasting time: All but a few involved matters such as removing an individual from the premises or assisting an ambulance, rather than any event involving a firearm. R.320-1. Finally, as with evidence of the May 23 encounter, the admission of the subject evidence and testimony during the first trial strengthened the district court's "ability to gauge the likely impact of the evidence in the context [of the retrial]." *Wash*, 231 F.3d at 3371.

* * *

Especially in light of the "special deference" owed to a district court's evidentiary rulings and that court's "first-hand exposure to the witnesses and the evidence as a whole," this Court should not disturb the lower court's rulings on the exclusion of evidence in this case. *Pulliam*, 973 F.3d at 782.[11]

---

[11] Further attacking the district court's decision to exclude certain defense evidence, Gay refers to the court's admission of evidence regarding several of his prior felony convictions, whereas (he argues) "one [conviction] would have been sufficient" to show his felon status. Def.Br.43. But the government had to show Gay's *knowledge* of that status, *see Rehaif v. United States*, 139 S. Ct. 2191 (2019), and multiple convictions help to establish such knowledge, where the defendant declines to stipulate, *see Greer v. United States*, 141 S. Ct. 2090, 2097 (2021). Moreover, Gay's passing reference to this issue is inadequate to state a separate challenge to that decision on appeal. *United States v. Butler*, 58 F.4th 364, 368 (7th Cir. 2023).

IV. The District Court Acted Well Within Its Discretion In Denying Gay's
    Motion For New Trial Based On "Newly Discovered Evidence"

   A.  Legal Framework and Standard of Review

   Under Rule 33 of the Federal Rules of Criminal Procedure, a court "may

vacate any judgment and grant a new trial if the interest of justice so requires."

Fed. R. Crim. P. 33(a). A motion for new trial based on newly discovered evi-

dence must show that the allegedly new evidence: "(1) was discovered after trial,

(2) could not have been discovered sooner through the exercise of due diligence,

(3) is material and not merely impeaching or cumulative, and (4) probably would

have led to acquittal." *United States v. Friedman*, 971 F.3d 700, 715 (7th Cir. 2020).

This Court reviews the district court's ruling on such a motion only for abuse of

discretion. *United States v. Coscia*, 4 F.4th 454 (7th Cir. 2021).

   B.  Analysis

   Gay asserts that the district court erred in denying his motion for new trial

based on an affidavit by a purported "video expert" who "slowed and

enhanced" Officer Sailor's bodycam video and stated that he could not see a gun

lying on the ground where the officers later found it. R.428. Gay's motion fell far

short of justifying a new trial based on newly discovered evidence, and denying

the motion was thus well within the district court's discretion. First, as the court

found, the bodycam video was "available from the beginning of discovery for

review by parties and experts if the parties had chosen to consult with [an

expert].” Sent.Tr.14. Thus, any analysis of the video “could . . . have been discovered sooner through the exercise of due diligence.” *Friedman*, 971 F.3d at 715. Although Gay’s motion asserted that he “did not have time to procure such expert testimony between his first trial and second trial” (R.428 at 1), that ignores the time leading up to the first trial.

Second, the statements made in the affidavit were exceedingly unlikely to have led to an acquittal. *Friedman*, 971 F.3d at 715. As an initial matter, the affiant did not aver that the gun was not there; he merely stated he could not see the gun on the slowed and enhanced video. R.428-1. Tellingly, that modified video was never provided to either the district court or the government. And even Gay appeared to be in no great rush to submit even the affidavit as evidence of his innocence: he filed his new-trial motion some four months after the affidavit was signed (and he was represented by counsel during that entire period). R.428-1.

As discussed above, the jury heard and saw more than enough evidence to support a finding that Gay possessed the Glock when he ran from the traffic stop and that he dropped or discarded the gun during his flight. Moreover, the jurors viewed the video for themselves, and they obviously credited the officers’ testimony. Tr.151-66.

V.   The District Court Acted Well Within Its Discretion In Scheduling The Retrial

"A district court's exercise of its discretion in scheduling trials and granting or denying continuances is almost standardless." *United States v. Egwaoje*, 335 F.3d 579, 587-88 (7th Cir. 2003) (cleaned up). "Thus, ordinarily the refusal of the trial court to grant a continuance is virtually unreviewable." *United States v. Davis*, 604 F.2d 474, 480 (7th Cir. 1979). "[W]hat constitutes abusive or arbitrary action on the part of the district court is a fact-sensitive inquiry," turning on "the particular facts and circumstances of the case." *Id.* This Court considers "(1) the amount of time available for preparation, (2) the likelihood of prejudice from denial, (3) the defendant's role in shortening the effective preparation time, (4) the degree of complexity of the case, (5) the availability of discovery from the prosecution, (6) the likelihood the continuance would satisfy the movant's needs, and (7) the inconvenience to the court." *United States v. Avery*, 208 F.3d 597, 602 (7th Cir. 2000). This Court will "reverse the district court's denial only for an abuse of discretion *and* a showing of actual prejudice." *Id.* at 601 (emphasis added).

Under this framework, this Court should defer to the district court's decision regarding the scheduling of the retrial. The court evaluated Gay's motion for a continuance against the backdrop of repeated past continuances during his first trial, which took place nearly two years after his indictment. *See supra* text at 12. Considering the retrial's specific circumstances, the court explained that the

parties had already prepared for and completed a full trial a month earlier on the same charges, so they "[knew] what it look[ed] like" and should not have needed much additional preparation. Pretrial Tr. 2. Supporting that conclusion, Gay's case was not complex. *Avery*, 208 F.3d at 602.

Moreover, proceeding with retrial on May 31, 2022, might not have left enough time to complete the trial due to issues with juror availability following the holiday weekend and the court's subsequent scheduling obligations. Pretrial 2. The court, which was aware of certain scheduling conflicts later in the spring, expressed its concern that continuing the case further could implicate speedy trial concerns. Pretrial 2, 6. That was well-founded given Gay's efforts during the first trial to add even excludable time to the speedy trial clock. *See supra* text at 12.

On appeal, Gay argues that the district court "set an unreasonably short period of time to conduct a retrial, then *sua sponte* advanced the date of the second trial by two weeks, and finally, it upset Mr. Gay's ability to present a defense by excluding the primary evidence Mr. Gay introduced at the first trial to support his defense." Def.Br.45. Gay has waived his specific arguments below that he needed more time to review transcripts from the first trial and was awaiting third-party documents by failing to develop them on appeal, and he

does not otherwise articulate a cognizable showing of prejudice. *United States v. Butler*, 58 F.4th 364 (7th Cir. 2023) (argument undeveloped on appeal is waived).

 Regardless, Gay's arguments lacked merit. He received transcripts from the first trial and, having attended the trial, knew of their contents anyway. Tr.7. Gay also agreed below that he had received "just about everything" he had asked for from the Rock Island Police Department, except certain 9-1-1 calls, which the court said it would ensure he got before presenting his case-in-chief. Tr.6, 11. Nor has Gay explained the relevance of the documents he wanted to obtain from the Illinois Department of Corrections regarding the Project Safe Neighborhoods letter either below or on appeal. Tr.7-8, 11-12, 231-37, 241-44; Gov.Ex.16.

Finally, the flurry of motions that Gay filed between the two trials – including a renewed motion for judgment of acquittal on the firearm count, two motions to reconsider, a motion in limine, a motion to suppress, a motion for stand-by counsel, and four requests for judicial notice – also indicates he had ample time before the retrial. R.310; R.312-316; R.318; R.319; R.321; R.324.

In short, Gay has shown neither an abuse of discretion nor actual prejudice resulting from the denial of his motion for a continuance. *Avery*, 208 F.3d at 601.

## VI. Gay's *Bruen* Challenge Is Waived And Lacks Merit

### A. Standard of Review

This Court reviews "questions of law in a district court's ruling on a motion to dismiss an indictment de novo," unless otherwise waived. *United States v. Chanu*, 40 F.4th 528, 539 (7th Cir. 2022).

### B.  Gay Waived His *Bruen* Claim

As an initial matter, Gay waived any challenge that 18 U.S.C. § 922(g)(1) is facially unconstitutional following the Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen,* 597 U.S. 1 (2022). On appeal, Gay specifically asks this Court to "address whether Section 922(g), *as applied*, violates the Second Amendment." Def.Br.26 (emphasis added). Gay nowhere suggests that Section 922(g)(1) is unconstitutional as applied to all felons. *White v. United States*, 8 F.4th 547 (7th Cir. 2021) (argument omitted from opening brief is waived).

Gay also has waived his as-applied challenge because he failed to develop it, either on appeal or below. *United States v. Butler*, 58 F.4th 364 (7th Cir. 2023); *see* R.403. Gay's argument on appeal that Section 922(g)(1) is unconstitutional as applied to him lacks any explanation, nor does it include any discussion of his own background (perhaps because he has more than twenty prior felony convictions). Def.Br.26-29; *see* PSR ¶¶58-75. Gay states only that "[o]n the

authority of the *en banc* court in" *Range v. Garland*, 69 F.4th 96 (3d Cir. 2023), he

"is entitled to relief."

The court in *Range* held that Section 922(g)(1) is unconstitutional as applied to

an individual with a disqualifying 1995 conviction under a misdemeanor statute

criminalizing false statements to obtain food stamps. 69 F.4th at 106. Though

*Range* held that the government had "not shown that our Republic has a long-

standing history and tradition of depriving *people like Range* of their firearms[,]" it

emphasized that its "decision [was] is a narrow one," applying only to Range. *Id*.

*Range* provides little or no guidance as to whether Section 922(g)(1) is unconstitu-

tional as applied to Gay, nor does Gay show otherwise. Further, the govern-

ment's petition for a writ of certiorari in *Range* is presently pending. *Garland v.

Range*, No. 23-374 (U.S. Oct. 5, 2023).

C.  Gay's *Bruen* Claim Is Without Merit[12]

The government acknowledges that, without benefit of this Court's decision

in *Atkinson v. Garland*, 70 F.4th 1018 (7th Cir. 2023), the district court held that

Section 922(g)(1) is constitutional without engaging in a fulsome discussion of

*Bruen*'s "text and history" test. R.412 at 4. The court, however, correctly decided

the issue: Section 922(g)(1) is constitutional. There is no need to remand this case

---

[12] The government's treatment of this issue herein is subject to word-count constraints. The government can provide supplemental briefing upon request, and notes that it will soon file a brief on this issue in *United States v. Prince*, No. 23-3155.

for further consideration by the district court, either, as this issue is squarely before this Court in *United States v. Prince*, No. 23-3155.

    1.  Legal background

The Supreme Court has explained that the Second Amendment guarantees the right of "law-abiding, responsible citizens" to keep and bear arms and ammunition for self-defense, but cautioned that the right remains subject to measures including "longstanding prohibitions on the possession of firearms by felons." *District of Columbia v. Heller*, 554 U.S. 570, 626, 635 (2008). In *Bruen*, the Supreme Court clarified the analytical framework for determining whether a firearm regulation is constitutional, asking whether such regulations "are consistent with the Second Amendment's text and historical understanding." 597 U.S. at 26.

*Bruen* first directed that "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." 597 U.S. at 17. Second, where a regulation infringes on presumptively protected conduct, "[t]he government must . . . justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24. The government may do so by "straightforward historical inquiry," which applies when "a challenged regulation addresses a general societal problem that has persisted since the 18th century." *Id.* at 26-27. To uphold such a regulation,

courts should identify "a distinctly similar historical regulation addressing that problem." *Id.* at 26. The second avenue is by historical "analogy" to the challenged law, aimed at determining whether it resembles historical restrictions. *Id.* at 28-29.

In *Bruen*, six Justices emphasized that certain firearm regulations, including prohibitions on felons' possession of firearms, remain constitutional. *E.g.,* 597 U.S. at 71, 79-80, 128-29. Nearly every federal court to have addressed the constitutionality of Section 922(g)(1) post-*Bruen* has consistently concluded that the statute remains constitutional. Indeed, since *Bruen*, hundreds of decisions have upheld the constitutionality of Section 922(g)(1).

One of those decisions is the Eighth Circuit' ruling in *United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023). Addressing an as-applied challenge, *Jackson* explained that *Bruen* "did not disturb" the Supreme Court's prior "assurances" that *Heller* and *McDonald* did not cast doubt on felon-dispossession laws; that "there is considerable support in the historical record" for a legislature's authority "to prohibit possession of firearms by persons who have demonstrated disrespect for legal norms of society" as well as those who are "deemed more dangerous than a typical law-abiding citizen"; and that history "supports the constitutionality of [Section] 922(g)(1) as applied to Jackson and other convicted felons, because the law is consistent with the Nation's historical tradition of

62

firearm regulation." *Jackson*, 69 F.4th at 501-06. The Tenth Circuit also upheld the constitutionality of Section 922(g)(1) in *Vincent v. Garland*, 80 F.4th 1197 (10th Cir. 2023). And numerous federal circuit courts, including this Court, have rejected *Bruen*-based challenges to Section 922(g)(1) on plain-error review. *E.g., United States v. Miles*, 86 F.4th 734 (7th Cir. 2023). The government acknowledges, however, that in addition to the Third Circuit's en banc decision in *Range*, a minority of district courts have found Section 922(g)(1) to be unconstitutional, either facially or as applied.

In June 2023, this Court issued a 2-1 opinion in *Atkinson v. Garland*, which raised an as-applied challenge to Section 922(g)(1) in a civil matter brought by a plaintiff with a felony mail-fraud conviction. 70 F.4th 1018 (7th Cir. 2023). *Atkinson* left open the question of Section 922(g)(1)'s constitutionality after *Bruen*. Instead, the panel majority remanded to permit the district court to undertake the *Bruen* analysis, since its decision was issued before *Bruen*. *Id.* at 1020. In dissent, Judge Wood explained that Section 922(g)(1) is constitutional because the statute "does precisely what statutes have been doing since the mid-18th century." *Id.* at 1018-38. "It identifies the group of persons deemed dangerous to the political community – those convicted of the defined felonies – and it makes it unlawful for them to possess a firearm." *Id.* at 1035-36.

2. Analysis

As an initial matter, the Second Amendment analysis is the same regarding the firearm and ammunition charges under § 922(g)(1). The Second Circuit has aptly explained:

> Guns are regulated because of their capacity to launch bullets at speeds sufficient to cleave flesh and shatter bone. Without bullets, guns do not have that capacity. Congress has the same interest in regulating bullet possession as firearm possession.

*United States v. Jimenez*, 895 F.3d 228, 238 (2d Cir. 2018). Moreover, certain historical regulations discussed below involved prohibitions on both firearms and ammunition.

### a. The Second Amendment does not protect felons' right to possess firearms and ammunition

On the first prong of *Bruen*, persons previously convicted of felonies are not included within "the people" protected by the Second Amendment under the plain text of the amendment. Rather, the Second Amendment's protections extend only to "ordinary, law-abiding, adult citizens," *Bruen*, 597 U.S. at 31-32, who are "members of the political community," *Heller*, 554 U.S. at 580.

Legislatures have historically had wide latitude to exclude felons from the political community as a consequence of their convictions. *E.g.,* Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28-29 (1868); Amar, *The Bill of Rights* 48 (1998). Similarly

today, committing a felony often results in the "forfeiture of a number of rights" tied to membership in the political community, including not just the right to bear arms but also "the right to serve on a jury and the fundamental right to vote." *Medina v. Whitaker*, 913 F.3d 152, 160 (D.C. Cir. 2019); *Richardson v. Ramirez*, 418 U.S. 24, 56 (1974).

Section 922(g)(1) accords with the historical meaning of the Second Amendment by imposing a firearms-related disability "as a legitimate consequence of a felony conviction." *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 708 (6th Cir. 2016) (en banc) (Sutton, J., concurring in part); *see United States v. Yancey*, 621 F.3d 681, 684-85 (7th Cir. 2010) (per curiam).

The Supreme Court's interpretation of the Second Amendment confirms that legislatures are permitted to disarm convicted felons. *Bruen*, like *Heller*, suggests that the right to bear arms belongs only to "law-abiding, responsible citizens." 597 U.S. at 26 (quoting *Heller*, 554 U.S. at 635). In fact, *Bruen* characterized the holders of Second Amendment rights as "law-abiding" citizens no less than fourteen times. *United States v. Posey*, 655 F. Supp. 3d 762, 771 n.5 (N.D. Ind. 2023). And while *Bruen* invalidated New York's "may-issue" licensing regime, it approved "shall-issue" regimes that "require applicants to undergo a background check or pass a firearms safety course" because such regimes are

"designed to ensure only that those bearing arms . . . are, in fact 'law-abiding, responsible citizens.'" 597 U.S. at 38 n.9.[13]

Further, an argument that the phrase "the people" must be used consistently throughout the Founding Era constitutional text attempts to paper over fundamentally different aspects of fundamentally different rights. For instance, non-citizens are not among "the people" who may vote in congressional elections. Additionally, an argument that "the people" should be defined consistently for purposes of various amendments "ignores differences between the rights protected by the First and Second Amendments." *United States v. Price*, 656 F. Supp. 3d 772, 775 (N.D. Ill. 2023).

      b. Section 922(g) is consistent with this nation's historical traditions

          i. Firearm disqualification laws

By the Second Amendment's ratification in 1791, there was an established tradition of legislatures exercising broad authority to categorically disqualify people from possessing firearms based on a judgment that certain groups were not trustworthy law adherents. *United States v. Carpio-Leon*, 701 F.3d 974, 980 (4th Cir. 2012).

---

[13] This Court's holding in *United States v. Meza-Rodriguez,* 798 F.3d 664 (7th Cir. 2015), does not alter this analysis. *Meza-Rodriguez* was written before *Bruen* and therefore did not have the benefit of *Bruen*'s repeated use of the phrase "law-abiding citizens" to describe the scope of the Second Amendment. *Atkinson*, 70 F.4th at 1023.

*England*

In 1689, the English government passed a law disarming Catholics (of both firearms and ammunition) who refused to make declarations renouncing their faith, reflecting the perception that such individuals had a propensity to disobey the sovereign. 1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm* 71-73 (1688). A focus on untrustworthiness, rather than, more explicitly, danger, has other historical roots. For instance, "the restored Stuart monarchs disarmed" even pacifist denominations due to frequent failure to enter loyalty oaths, which raised concerns that they believed that "their faith exempted them from obedience to the law." *Range*, 69 F.4th at 120-21 (Krause, J., dissenting).

Those examples are particularly relevant because the same Parliament wrote the 1689 English Bill of Rights, which "enshrined basic civil liberties" and became the predecessor to our Second Amendment. *Bruen*, 597 U.S. at 43-45; *Heller*, 554 U.S. at 593; *Atkinson*, 70 F.4th at 1031 (Wood, J., dissenting). That predecessor specified that "*Protestants* may have Arms for their Defence suitable to their Conditions *and as allowed by Law*." 1 W. & M., Sess. 2, c. 2, in 6 *The Statutes of the Realm* 143 (1688) (emphases added). Parliament thus retained the power, which it exercised, to arm one class of the population and to disarm another based on concerns regarding compliance with the law. *See Atkinson*, 70 F.4th at 1031.

*Colonial America*

The American colonies inherited the English tradition of broad legislative authority to disarm classes of people who were believed not to be dependable adherents to the rule of law. Several early firearm regulations were discriminatory and are a shameful part of the nation's history, including those regulations intended to disarm Native Americans and Black persons. These firearm regulations may nonetheless partially inform the *Bruen* analysis given that a survey of historical regulations is required. *See Jackson*, 69 F.4th 503; *Range*, 69 F.4th at 122 n.50 (Krause, J., dissenting). Certain of these regulations extended both to firearms and ammunition. *See, e.g.*, 1 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 255-56 (1823); 2 *Records of the Colony of Rhode Island and Providence Plantations* 561 (1857).

Other early regulations also aid in the historical analysis: For example, the colonies disarmed full-fledged members of the political community whom the authorities believed were untrustworthy. *Range*, 69 F.4th at 122 (Krause, J., dissenting). Massachusetts also disarmed the supporters of an outspoken preacher, believing their conduct "evinced a willingness to disobey the law." *Id.* at 123.

### Revolutionary War

Throughout the Revolutionary War, American legislatures passed numerous disarmament laws targeting those who failed to demonstrate loyalty to the American government. *See, e.g., The Public Records of the Colony of Connecticut From May, 1775 to June, 1776*, at 193 (1890) (1775 Conn. law); 1776 Mass. law at 479-80. And, in 1776, the Continental Congress recommended that colonial governments disarm those who were "notoriously disaffected to the cause of America" or who simply had "not associated" with the colonial governments in the war effort. 4 *Journals of the Continental Congress 1774-1789*, at 205 (1906) (resolution of March 14, 1776). At least six of the colonies enacted legislation in this vein. *Jackson*, 69 F.4th at 503; *Atkinson*, 70 F.4th at 1034 (Wood, J., dissenting).

Several Revolutionary War-era loyalty oath laws stripped the right to possess ammunition as well as firearms. *E.g., 7 Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (1862); *Acts of the General Assembly of the State of New-Jersey at a Session Begun on the 27th Day of August, 1776*, at 90 (1777); *Act of Apr. 1, 1778*, ch. LXI, § 5, 1777-1778 P.A. Laws 123, 126.

### Ratification Debates

The history behind the Second Amendment's adoption provides additional evidence that the founders understood the individual right to bear arms to be compatible with broad legislative authority to disarm groups who could not be

trusted to follow the law. *E.g., Heller*, 554 U.S. at 604 (citing Antifederalist-proposed constitutional amendment allowing disarmament due to crimes); 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 627, 665 (1971); *see* 2 Schwartz, *id.*, at 675, 681, 758-61 (noting amendments proposed by Samuel Adams and New Hampshire). To be sure, the Second Amendment, as adopted, does not include the same language as these proposals. But it would nonetheless have been "obvious" to the founders that certain groups, including "the felon" could properly be subject to disarmament laws consistent with the "*pre-existing right*" that was "codified" in the Second Amendment, *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 592).

The overarching agreement among early leaders in this country that some degree of regulation on firearm possession was necessary is also telling when conducting the historical analysis. Indeed, the absence of any meaningful founding-era "disputes regarding the lawfulness" of potential regulations disarming criminals enables courts to "assume it settled" that such regulations are "consistent with the Second Amendment." 597 U.S. at 30.

ii.  Felony punishment laws

Capital punishment and forfeiture of estate were commonly authorized punishments for felonies in the American colonies, and then the states, up to the time of the founding. *See Medina*, 913 F.3d at 158; *Baze v. Rees*, 553 U.S. 35, 94

(2008) (Thomas, J., concurring). States in the early Republic likewise treated "nonviolent crimes such as forgery and horse theft" as "capital offenses." *Medina*, 913 F.3d at 159.

As the D.C. Circuit has observed, "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Medina*, 913 F.3d at 158. "[T]radition and history" therefore show that "those convicted of felonies are not among those entitled to possess arms" under the Second Amendment. *Medina*, 913 F.3d at 158, 160.

c.  Gay's as-applied challenge also fails

Even if not waived, Gay's as-applied challenge fails. Gay has proffered no historical evidence to support a position that the constitutionality of Section 922(g)(1) turns on individualized assessments. *Atkinson*, 70 F.4th at 1023 (identifying a similar flaw). Instead, as discussed above, the historical tradition supports the legislature's ability to disarm specific categories of individuals.

Nor has Gay proffered any historical evidence to support an argument that, even *if* the historical tradition supported disarming only "dangerous" individuals, the definition of "dangerous" necessarily involves force. *Atkinson*, 70 F.4th at 1024. Rather, as set forth above, the historical tradition reflects a far broader conception of "dangerous," one that includes even the *risk* of violence.

Finally, this Court has never upheld an "as-applied" Second Amendment challenge to Section 922(g)(1) and has, in fact, "repeatedly rejected as-applied Second Amendment challenges" to that statute. *Kanter v. Barr,* 919 F.3d 437, 443 (7th Cir. 2019). While the Court "left room for as-applied challenges[,]" it has not yet opened that door. *Id.*

Here, Gay has repeatedly demonstrated an unwillingness to abide by the law. His right to bear arms is not covered by the plain language of the Second Amendment. He has more than twenty felony convictions, including convictions involving violence. *See supra* text at 3, 31. Those convictions reflect the risk Gay poses to public safety, his disregard for the law, and society's inability to trust that he will use a firearm or ammunition responsibly.

In short, an as-applied challenge to the constitutionality of Gay's firearm and ammunition counts must fail.

## CONCLUSION

This Court should affirm the judgment of the district court.

Respectfully submitted,

GREGORY K. HARRIS
  *United States Attorney*

By:    /s/ W. SCOTT SIMPSON
      *Assistant United States Attorney*
      *Office of the United States Attorney*
      *318 South Sixth Street*
      *Springfield, Illinois 62701-1806*
      *(217) 492-4413*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and (a)(6), as modified by Cir. R. 32(b), because I have prepared this brief in proportionally spaced typeface using Microsoft Word for Office 365 in 13-point (body) and 12-point (footnotes) Book Antiqua font. I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), as modified by Cir. R. 32(c) and by this Court's order permitting the government to file an oversized brief in this case (CA7 R. 34), in that it contains 15,448 words.

/s/ W. SCOTT SIMPSON
   *Assistant United States Attorney*

**CERTIFICATE OF SERVICE**

I certify that on January 26, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

 /s/ W. Scott Simpson      
*Assistant United States Attorney*
